Sanchez v. City of San Antonio May it please the court, my name is Justin Reyes and I represent the appellant Gabriel Sanchez in the lawsuit against his former employer, CPS Energy. There are two key issues in this case in which the district court committed a multitude of errors. First, the district court found a lack of sufficient evidence to establish Mr. Sanchez was qualified on the date of his termination, March 8, 2016, to serve as a journeyman cable splicer in CPS Energy's underground department. And second, the district court found a lack of sufficient evidence to create a genuine issue of material fact as the pretext. Now if you read this record cold, you may come away with the understanding that Mr. painted in this litigation and a reasonable jury could draw that inference. But on this record, in reviewing the totality of the record, a reasonable jury could conclude that CPS Energy did not truly believe Mr. Sanchez was an unsafe worker or that any of the alleged events were deemed to be serious safety violations at the time that they occurred since CPS Energy did not discipline Mr. Sanchez save for one minor event. It did not immediately terminate Mr. Sanchez's employment. It did not properly document or investigate these events as being serious safety issues. And more importantly, CPS Energy and its decision makers could not even present a coherent story as to why Mr. Sanchez was fired and who made that decision. And that's absolutely inappropriate. An employer ought to be able to state every single time consistently the reasons behind its actions and the individuals who made that decision. Now there's one fact admitted in this case and it's key to resolution on the appeal. What prompted the meeting that resulted in the termination of Mr. Sanchez's employment is this. In February of 2016, Mr. Sanchez notified CPS Energy that he was ready to return to work and his doctors were going to release him soon. That fact is admitted by CPS Energy and in fact the district court noted in its opinion the causal connection between Mr. Sanchez and the termination meeting. But in this case, CPS Energy contends that PTSD or disability played no role and that safety did in its decision. Even though there's evidence on the record that PTSD was discussed at the one and only termination meeting. Nonetheless, what's clear is this. On this case, on this record, a jury, a reasonable jury, could draw opposite inferences. An obvious inference is that Mr. Sanchez's intention of returning from the medical leave that was improving his symptoms of PTSD prompted the termination. That inference is strengthened by the fact that CPS Energy did not immediately terminate Mr. Sanchez after any of these ostensible safety violations. The inference is further strengthened by the fact that CPS Energy did not properly document or investigate those events after any of these alleged ostensible safety issues. While a reasonable jury on Mr. Sanchez because of PTSD, or rather safety, a reasonable jury also could conclude based on the evidence in this record that Mr. Sanchez was terminated because of PTSD. With regard to the qualified element, the question that was before the district court and the question that is before this court this morning is whether Mr. Sanchez could have performed the essential functions of his job as a juryman capable of splicer in the underground department with or without a reasonable accommodation. In this case, Mr. Sanchez was being reasonably accommodated by way of his medical leave. In fact, the medical leave was working and his symptoms of PTSD were improving. And that's noted in the medical records or documents, the same medical records in which the district court based its decision to conclude that Mr. Sanchez's leave, or rather his accommodation, was unreasonable because his leave was indefinite and was not set to end at any particular point in time. But for the district court to come to that conclusion, it had to draw factual inferences in favor of CPS energy and it had to weigh the evidence. What evidence supports what pre-termination evidence supports that he could do his job? Well, Your Honor, I would look at record 1802 to 1806. This is a post-termination report, but the doctor in this report had conducted a series of what he calls Beck tests. And those Beck tests conducted in October of 2015 and January of 2016, and I remind the court, Mr. Sanchez was notified of his termination in March. Those Beck tests showed that Mr. Sanchez's anxiety and depression were improving dramatically. Improving dramatically. Does that mean that he's qualified for his job at the time? Is that enough? Well, Your Honor, a reasonable jury could conclude that the accommodation of leave was working and it would have enabled Mr. Sanchez to return at some definite time. And we know that he could return in the future. It's was he, on the day he was terminated, qualified? Well Your Honor, the... Isn't that right? Is that wrong or right? No, I would slightly disagree. So the question is whether or not he could perform those essential functions on the date of the termination with or without a reasonable accommodation. This court has reiterated over... What was the accommodation he asked for? The accommodation was a leave, his medical leave. You're not performing your job if you're on leave. So, if you're... Could he perform his job with some accommodation in the workplace on the day he was terminated and what evidence supports that? Yes, Your Honor. So, on one hand, he had testified that he was ready to work. He was ready to return to work and he felt as if his doctors were going to release him soon. He notified CPSU Energy, as I mentioned earlier, of that in February of 2016. The evidence from the Dr. McMahon's report, Record Page 1802-1806, shows that his health was improving and that his leave was working and he would, at some point, be able to come back. But I would direct this court to what I believe is, if we're looking at one piece of evidence, in which we've went on in our brief pointing out the error committed by the district court in reviewing the evidence in isolation. But if we're looking at one piece of evidence, on March 21st, 2016, Mr. Sanchez was allowed to go back to work. Now, of course, by this point, on March 8th, he had already been terminated. But the question is whether or not his accommodation of leave was reasonable. And this court has stated, and even in the cases cited by CPSU Energy in their brief, that leave that's definite in time is reasonable, rather than leave that's indefinite, that you never know when it's going to end, that's an unreasonable... Sure, but I think that's an issue for, on one hand, it's an issue for a jury to decide, that's a factual issue. There's a fact issue as to whether or not one year or a few months or five years in your example is reasonable. But, we know that on March 21st, 2016, Mr. Sanchez was released to return to work. And there was only one restriction placed on him, and that was heights, and the doctor also referenced scaffolding. This is on Record Page 1800, it's a report from his primary treating physician, Dr. Hernandez. That's the normal part of the job, though, for the journeyman cable worker. No, Your Honor. I mean, that's... No, no, we submit that it's not, and again, I remind the court, he was an underground journeyman cable sweep. Okay, underground, I'm sorry. Is that underground? Yes, Your Honor, so his, the primary... Okay, so that could be an accommodation? So, Your Honor, there were occasions in which he worked at heights, but that was a marginal job duty. What's telling on this record is that there's not a policy, a description, or a document from CPS Energy that states heights was an essential function. His primary job, the core of his job was working in small manholes under the roadways of San Antonio. He was spiking cables, cutting wires, working with hot molten lead at times. That was his job. Yes, from time to time, he did work in a bucket, if you will, but that was an occasional duty. That was not, his job was not going to change if he couldn't perform that function. And what's telling to me, Your Honor, is that for the first time on appeal, CPS Energy points to a couple of different documents to support its position that heights was an essential function of his job. But those documents, that's, it's not evident. They pointed to emails and a couple of documents that were never actually implemented. Heights was not an essential function of his... Are you saying the documents aren't properly in the record? No, no. You're saying they're turning to him the first time on appeal. I didn't really understand what you're saying. No, no, Your Honor. They're to support as evidence of their position that heights was an essential... They were already in the summary judgment record, right? Correct. But, but Your Honor, the point had not been brought up, unless I just completely missed it, but I know that the point had not been brought up in their briefing on summary judgment that heights was an essential function of his job. And so, so, so we know that as of the 21st, he could have performed the duties and the functions of a journeyman cable splicer in the underground apartment. And, you know, going back as well, the heights component, even if that was an essential function of his job, we know that by way of that same report, record page 1800, we know that he, that that would have ended or expired in May of 2016. Again, a definite period of time. But, but again, Your Honor, there's not a shred of evidence in this record. There's not a policy, a description, or, or, or any proper document from CPS Energy that even remotely evidences heights as an essential function of his, of his job. It seems to me that your argument is really focused on, well, they didn't have documentation, and they weren't clear. Well, that matters if there are articulated and prima facie case of, of discriminatory treatment. But, you know, it's always smart for an employer to have that, to defend against it. But it doesn't mean that, well, they're liable if they don't have the documents. You have to show all the elements that you have to show first. You, you get, you understand that. Yes, Your Honor. So how is the fact that they took a long time to terminate him alone enough for pretext? You know, if he had done a whistleblower complaint the day before, and then that, you know, you can think of a number of scenarios where the timing lapse could be evidence of pretext. But just on its own, I don't believe we have any case law in this circuit that the timing lapse alone without some event happening in the time frame that was the true pretextual reason. So can you help us with that? Yes, Your Honor. And, and one of the things that the court alleged the district court committed was reviewing the pretext evidence in isolation, on its own, pointillistically, if you will. This court in Miller v. Raytheon, I believe it's a 2013 case, stated that evidence considered in isolation may be insufficient to lead to pretext. But that's not how the courts are to review the pretext evidence. The pretext evidence should be reviewed in totality. I will submit to this court, perhaps a failure to follow their corrective action policy, maybe a reasonable jury could find that that's not enough to create a pretext, a pretext issue. But it's not just the failure to follow its corrective action policy or just a delay in the termination. There is a number of, a plethora of evidence, if you will, that Mr. Sanchez brought to show a genuine issue of material fact as a pretext from the failure of their decision makers to get on the same page as to why Mr. Sanchez was terminated. It's a real reason. You know, what's the reason that you believe? Well, yes, Your Honor. So the reason is because Mr. Sanchez had PTSD. But the decision makers, there's no evidence in the record that they knew that. Well, there's evidence in the record that at the only termination meeting, PTSD was discussed. And the district court essentially gave the two decision makers, or excuse me, the one decision maker who testified about this discussion a pass and said, well, the district court said, well, it actually wasn't discussed at this termination meeting. In fact, they were discussing Mr. Garza's PTSD rather than Mr. Sanchez's PTSD. But the district court drew that inference in favor of CPS Energy. That's an inference that should be drawn in favor of Mr. Sanchez. A reasonable jury could find that if PTSD was discussed at this meeting, then they were discussing Mr. Sanchez's PTSD diagnosis. Even the mere... Did they specifically testify that they didn't know? I thought that the two people said they did not know. Am I wrong on that? No, no, you're correct. There's, and, you know, out of the decision makers and even that's up in flux as to who they are, Lisa Lewis and Fred Bonnewell, two of the decision makers, testified that they weren't aware of Mr. Sanchez's PTSD diagnosis. But the evidence in this record suggests that their credibility, and quite frankly, the credibility of the majority of the CPS Energy witnesses is at issue. There is a substantial depth of contradicting testimony, statements, positions, as to the two most basic fundamental aspects of their defense. Okay, you said time for rebuttal, and you might want to tell us about that on rebuttal if you want to use it. Yes, Your Honor, thank you. May it please the Court, my name is Christine Reinhardt and I represent CPS Energy, the appellee in this matter. We believe the District Court issued a well-thought-out, 43-page opinion analyzing the many arguments made by Mr. Sanchez as to why he believed the decision CPS Energy made, based on four different incidents that occurred in less than a year, in which Mr. Sanchez had violated known safety rules, was a proper reason to terminate him one, to terminate him from employment, and better yet, it was not a discriminatory one. I do believe that this case can be decided on one element, and that's the qualification element. That is part of the prima facie burden that Mr. Sanchez bears in bringing his ADA disability discrimination case, and it is a critical burden that he must prove. What about his argument that you needed to accommodate him by giving him leave? Your Honor, I believe that the law on this circuit has been, is he qualified as of the time of his discharge, which is March 8, 2016. There is law that says, also, is that with or without an accommodation. However, when we turn to leave, the question is, is there a definite leave that would be provided? In this case, the issue with, there's a couple issues with Mr. Sanchez saying, I should have been given leave. One, he never asked for it, and he admits that in the record. He also never asked for any job accommodations. He never asked for a change in his job duties. He never did that, but turning back to the leave. He already had leave as of that time. He was on leave. He was on leave. That's correct, Your Honor. And was it clear that he was definitely coming back on day X? It seemed like they said maybe March 7, but I didn't ever see where someone said before he was fired, you will definitely return on X date. That's correct. There's no evidence in the record that he was going to return. In fact, he was deposed and asked specifically in the record, were you released as of March 7, 2016 or March 8? And he said no. He was not released in any capacity at that point, not even with restrictions. Even if he had asked, was he allowed, were you required to allow him to continue to be on leave for months or years? No, not necessarily. He had exhausted by that point in time his required FMLA leave. At that point in time, it became just a matter of CPS energy policy. Discretionary. Correct, Your Honor. Let me ask about his leave. There's a medical report that said March 7, he would not be able to return to work through March 7. May, that was in January, that was said. There's this issue of what the company knew about PTSD. There's no indication that that medical leave had anything to do with anything other than his injuries. Is there no suggestion, nothing that would create a jury issue that he was being treated for something other than physical injuries? No, within the record, and the way it works at CPS energy, the medical reports all went to essentially a medical department. Those reports weren't shared generally with everyone. As a result, the injuries that he did have did include physical injuries, and then he also was diagnosed with PTSD as a result of the fourth incident from which he was injured. As a result, he was required to have behavioral medicine clearance before he could ever return to work. He actually never obtained that. Now, in Mr. Reyes's presentation, he talked a lot about a report that's 1802 to 1806 in the record, and about Mr. Sanchez improving. Improving, though, is not the same as a doctor saying you can come back to work. And, in fact, that particular doctor who wrote the report said specifically, and I quote on 1805, as for his abilities to return to work, it is recommended that he return to full-time employment, but in a job that is not related to electrical work. The anxiety he experiences when working on electrical jobs interferes with his ability to concentrate on the job, making it difficult for him to work efficiently. In addition, a referral to DARS for vocational evaluation and job retraining is recommended. And it wasn't just Dr. McMahon's report that is in the record. What Mr. Sanchez doesn't mention is that there is another doctor's report in the record, Dr. Hernandez, who at the end of June of 2016, which would have been beyond any leave policy, even if it was allowed for CPS Energy and wasn't discretionary, at that point in time, Dr. Hernandez specifically said Mr. Sanchez can't work at heights, he can't work at scaffolding, and he said no work with electricity. Needless to say, as an electrical journeyman, that was the crux of his job. That's why I think this case is similar to that in terms of Reed versus Petroleum Helicopters. And in that case, the pilot in that case was not able to return to work as the date of discharge, and there was no evidence that the pilot would be able to return to doing what's crucial to that job, flying. And in that case, the Fifth Circuit held that the plaintiff in that case was not qualified for employment and thus could not proceed with the discrimination claim that they had asserted. Now, to address one of the arguments that Mr. Reyes also made with regard to Mr. Sanchez in terms of the requirement of heights, that he couldn't work on heights or scaffolding, and that wasn't an essential function of the job, I think what's most crucial about that is that argument was not raised to the court below, and so it cannot be raised now on appeal. In other words, Mr. Sanchez did not challenge that working at heights and scaffolding was not an essential function of his job. He did not raise that argument in any way. There's also no testimony in the record that that wasn't. In fact, the record, including even evidence from Mr. Sanchez himself, on 1776, he's asked in September after this last for safety incident, what do you think you can't do with regard to your job? No ladder and no scaffolding. One of the safety incidents involved for which he was counseled about was he was up in a bucket riser, obviously at heights, and he was booming down and hit a streetlight wire that caused a flash or an arc. His own counselor's notes indicate that Mr. Sanchez told her that he felt good because he was able to get up in the raised bucket and was doing well. So even if you look at the record evidence itself, it supports that those were essential job functions of Mr. Sanchez. A couple of other arguments. I do think this case is also similar to Moss v. Harris County as well as Valentine v. Varco as well, which are published Fifth Circuit decisions as well. Also, with regard to a few other cases that Mr. Sanchez cites from the Ninth Circuit, I do think there's a critical distinction between those cases and this case here with Mr. Sanchez. In those cases, the Ninth Circuit found a fact issue on qualification because there was undisputed evidence in the record that the plaintiff could return to work on a specific date and perform all essential job functions. That is what's missing here in this record, and that's something that Judge Rodriguez, who wrote the lower court opinion, stated on page 254 of his opinion, or 2454 of his opinion. Do you have anything else, counsel? I would like to address, if the court would like, I can't address any of the pretexts. We do believe that the court can affirm on pretexts as well for the very specific reasons issued by the district court, that there wasn't any material issue of fact presented by Mr. Sanchez. But we do believe that this case can be decided on the qualification element itself. So for that grounds, we would ask that the court affirm the lower court's ruling. Thank you. You've saved time for rebuttal, counsel. Your Honor, there's a couple points I want to address, and I'll do my best to be brief. CPS Energy argued, or Ms. Reinhart argues, that we never raised the issue of the essential job function issue in summary judgment. We took the position that Mr. Sanchez could perform the essential functions of his job, thereby we can now argue that, we can discuss that essential function on appeal. We took the position that he could perform the essential functions of his job. I would also direct or stress to this court that to even entertain discussing and analyzing CPS Energy's evidence as to the height's essential function, that would require this court to make factual inferences in a way of the evidence, and those are functions of a jury. Only if there's conflicting evidence. Well, but the conflicting evidence is the lack thereof of documents, the lack thereof of a job description, the lack of a policy. This court has decided cases in the past where the court looks to the employer's judgment as to what the essential functions of the job are, but here all we have in this record is argument in the briefs. There's nothing actually from CPS Energy that points to heights being an essential function of the job. The evidence that Ms. Reinhart referred to, there's a couple of email chains, a light duty offer that was actually never implemented, a performance improvement plan that was actually never implemented where there's references to a bucket, and yes, admittedly, one of the events that CPS now claims Mr. Sanchez acted unsafely involved a bucket, but this is a marginal job duty to what his essential functions were. Again, that was working. Where do you get that from? The evidence in the record. If you look at the events and the majority of the safety events that CPS Energy now contends he acted unsafely revolve around a manhole, but that's the conflicting. I'm just saying because it seems that he worked mostly underground, it's a marginal job duty. Do you have any evidence? Does he even have testimony or something that would say it was not part of my job to be up in the bucket? No, Your Honor. There is no testimony to that effect. So is there any evidence summary judgment on your side? Isn't it y'all's burden to make the prima facie case? To show. At least present a fact question on the prima facie case. Yes, Your Honor, and to present a fact issue. Where would we look in the record to find that you did that on this point of the bucket? Your Honor, and there's a few pages, but I would refer this court to where, and I guess I should point out one of the non-exhaustive factors, if you will, provided by the EEOC in determining an essential function is the amount of time spent on the job. And so I would point this court to the events that they have alleged my client committed unsafe acts, where the majority of those events were spent working on a manhole. The record evidence, even in the report, and I don't have the precise pages off the top of my head, but the report of Dr. or rather Mr. Coffey, who is one of the experts retained in this case, vocational expert, if you will, where he's discussing Mr. Sanchez's capabilities and job duties as a journeyman cable splicer in the underground department. Also, another point that I wanted to bring up, Ms. Reinhart referred to the Reed v. Petroleum Helicopters case and the Moss v. Harris County Constable Precinct 1 case. Our case and those cases are hardly similar. I beg to differ that they're remotely similar. Those cases involve situations where the plaintiff went on record, such as in the Reed case, and put in SSDI applications that she was totally disabled. She was unable to perform the job. We don't have that here. Also, in the Reed case, the employer had required a valid medical certification for her to return. We don't have that here either. Even though CPS Energy could have done that, it's contained in their leave policy, but they never requested one directly from Mr. Sanchez. Lastly, Your Honors, where I ended in my opening with regard to the pretext, there is a plethora of inconsistencies, contradictions, shortcomings on behalf of CPS Energy that I believe that this Court should review in totality. These cases are not easy cases to prove up. These are difficult cases to prove up, and we rely on circumstantial evidence. There is evidence in this record that a reasonable jury could conclude PTSD was discussed at the one and only termination meeting. That was an inference that should have been drawn in favor of Mr. Sanchez. With that, unless there are any further questions, I would like to thank the Court for your time and your inquiries. Thank you.